**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 22-cr-20119-CR-MORENO/GOODMAN**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

JULIUS DANTE BROWN

      Defendant.

_____/

## REPORT AND RECOMMENDATIONS ON MOTION TO SUPPRESS

This ruling involves a six-count indictment for charges concerning conspiracy to commit access device fraud (Count I, in violation of 18 U.S.C. § 1029(b)(2)), aggravated identity theft (Count 2, in violation of 18 U.S.C. § 1028A(a)(1)), conspiracy to commit money laundering (Count 3, in violation of 18 U.S.C. § 1956(h)), and money laundering (Counts 4-6, in violation of 18 U.S.C. § 1956(a)(1)(B)(i)). It recommends that Senior United States District Judge Federico A. Moreno **deny** Defendant Julius Dante Brown's motion to suppress all evidence seized from what he says was an unlawful search of a notebook found by police in a backpack in a stolen car he was driving.

The factual and procedural background underlying this Report and Recommendations is outlined below.

## I.    Introduction

After a federal grand jury returned a six-count indictment charging him with the crimes outlined above, Brown filed a motion to suppress (in which he also asked for an evidentiary hearing). [ECF No. 25]. Judge Moreno referred [ECF No. 28] the motion to the Undersigned and the United States filed an opposition response [ECF No. 40]. Brown did not file an optional reply, and the Undersigned held a four-hour evidentiary hearing.

In the suppression motion, Brown argued that the collateral estoppel doctrine required his motion to be granted. According to his theory, the Miami-Dade State Attorney's Office (which was prosecuting Brown on state charges arising from the same fact pattern) dropped the state charges after he filed a motion to suppress. Although the state court judge did not ever rule on the suppression motion, Brown's counsel explained that she spoke with Brown's other defense lawyer (in the state case) and was told that the prosecution there dropped the case because it knew the suppression motion had merit.

Flagging the fact that the state court judge had not actually issued a substantive *ruling*, the Undersigned directed [ECF No. 50] defense counsel to conduct further research and either file a post-hearing notice advising that the collateral estoppel doctrine was *inapplicable* or a substantive memorandum of law urging that the doctrine be applied (and result in an Order recommending that the suppression motion be granted here).

A few days after the evidentiary hearing, Brown filed a Notice advising that the collateral estoppel doctrine did *not* apply here, "where a state prosecutor files a *nolle prosequi* before the state court rule[s] on a then-pending motion to suppress." [ECF No. 54]

In addition, the Undersigned's post-hearing administrative Order required Brown to submit a supplemental memorandum of law on two topics:

First, whether the automobile exception to the Fourth Amendment authorized the detective to seize the notebook, photocopy the notebook, and show two pages from it to Brown after the detective determined there was nothing of value in it for purposes of the policy underlying the inventory search of the car and its contents. As part of this discussion, Defendant was instructed to also discuss his argument that the situation is analogous to the scenario where the government needs a search warrant in order to search a cell phone that has already been seized.

Second, why Fla. Stat. § 817.5685(3)(b)1, criminalizing possession without authorization of identification information of five or more people, did not give the detective the right to photocopy the pages of the notebook and show them to Brown during the detective's investigation of a personally identifiable information (PII) offense.

Brown filed the required post-hearing memorandum [ECF No. 55], and the United States filed its required response memorandum [ECF No. 56].

For the reasons outlined in greater detail below, the Undersigned **respectfully recommends** that Judge Moreno **deny** Brown's motion in whole. By way of introductory summary, though, the Undersigned concludes that: (1) police had grounds to search the car and its contents under the automobile exception; (2) police had grounds to review the notebook under the inventory search doctrine; and (3) the detective did not violate Brown's constitutional rights when he made copies of two pages from Brown's notebook (after seizing it) and showed them to Brown during a post-*Miranda* interview.

## II.    Findings of Fact

Detective Kenneth Sealy

Kenneth Sealy is a detective with the Aventura Police Department, assigned to the economic crimes unit. He is also a task force officer with the United States Secret Service. He has been an Aventura police officer for 19 years. He became an economic crimes detective in 2010 and is now a senior economic crimes detective.

In that capacity, he routinely handles investigations involving identity theft, credit card fraud, wire fraud and tax return fraud. According to Sealy, the Aventura Mall is the second largest mall in Florida and the largest in South Florida. Because of its size and the presence of high-end stores, the mall attracts a significant amount of fraud.

Sealy teaches basic fraud and has taught for the Internal Revenue Service. He has testified as an expert on identity theft or fraud three times in Southern District of Florida courts.

4

Sealy explained that Brown was stopped in an Aventura Mall parking garage on November 13, 2020 because he was driving a Ford Escape which the Hertz car rental company had reported as stolen approximately ten days earlier. The stolen vehicle report was entered into the NCIC system. The Aventura Police Department has license plate readers at the Aventura Mall and those readers generated a hit for a stolen vehicle. A police dispatcher researched the tag, confirmed the vehicle was stolen and issued a "BOLO."

Coincidentally, Sealy was with the detective who was investigating the stolen vehicle and they both headed toward the Bloomingdale's garage in the shopping mall. They spotted the vehicle on the 5th floor of the garage, preparing to park. Brown was exiting the vehicle when Sealy first saw him. According to Sealy's testimony, he identified himself to Brown and explained that police were detaining him because he was driving a vehicle reported as having been stolen.

As explained by Sealy at the hearing, Brown said he had borrowed the vehicle from a friend. He advised Sealy that he had a book bag in the vehicle. Police placed Brown in a secure police vehicle.

Sealy testified that the Aventura Police Department policy is to tow a seized vehicle to the tow yard. It is then released to the owner from the tow yard. Before the seized vehicle is taken to the tow yard, however, police must first conduct an inventory

of the vehicle's contents. Police conducting an inventory search are looking for things of value.[1]

Section II.A(7) of the policy provides, in pertinent part, that "all towed or impounded vehicles must be **inventoried,** including the trunk, all compartments, packages, **containers,** and **bags** or similar objects." (emphasis added). It also provides that "[p]ackages, containers, suitcases, etc. found inside the vehicle that are locked or wrapped and **cannot be opened without force or causing damage**, and in the absence of exigent circumstances, will not be opened." (emphasis added).

Section II.B(1) of the policy provides: "Any vehicle or property impounded by the Aventura Police Department must be inventoried and recorded on a Vehicle Tow Sheet and/or a Property receipt and contain owner [sic] as much descriptive information as possible." Section II.(B)(2) provides as follows: "In the event that articles are removed from a vehicle, or discovered during inventory by Police Officers for use as evidence in a criminal proceeding, the article shall be listed as being found in the vehicle and the location where it is found shall be listed.  A note shall be made in the comments section that these particular items were removed as evidence."

Because the vehicle's owner is Hertz, as opposed to a private individual, police could not simply call Hertz and ask it to come to the Aventura Mall. Sealy explained that

---

[1]     Aventura's policy is contained in General Order 309, entitled "Towing, Storage and Release of Vehicle." The United States filed it as an exhibit to its Response memorandum. [ECF No. 40-2].

corporate owners like Hertz do not typically send an employee out to recover the stolen vehicle. In addition, Sealy explained, neither the driver (Brown) nor his passenger had any legal right to the vehicle. Therefore, the vehicle had to be towed or impounded.

Sealy explained that the property impounded must be inventoried and listed on a tow sheet and/or a property receipt form. The purpose of this policy, Sealy explained, is to protect both the police and the owner/occupant from incorrect accusations about things of value in the vehicle.

Sealy testified that he has been involved in inventories of cars and their contents hundreds of times and has been involved in inventories of stolen cars approximately one hundred times. He explained that it is not uncommon to recover personal items of individuals in stolen cars, such as wallets, identification cards, and paperwork. Personal effects help indicate who had custody and control of the vehicle during the time it was reported stolen.

Sealy intended to conduct an inventory search. He started it from the front passenger door of the vehicle and worked backwards in a clockwise manner.

During the inventory of the Escape, police found a cross-body purse in the front passenger seat and a backpack on the floor behind the passenger seat. Police found a firearm in the backpack and removed the ammunition. Sealy testified that he learned later that Brown has a conceal carry permit.

Sealy testified that he found several items in the backpack, in addition to the firearm: several pieces of loose papers, a money strap (for $2,000 in currency), bank receipts, an envelope from TD bank (with money order stubs in it), a brown notebook and a t-shirt, a TD Bank business card, a deposit slip, a TD Bank envelope and nine postal money order stubs (each in the amount of $1,000).

The notebook was closed, with snaps on it. Sealy did not notice anything sticking out of it. The notebook was the last item to be inventoried.

The snaps merely closed the notebook; they did not lock it. The notebook could be opened without damaging it.

According to Sealy's testimony, it is possible to put cash, checks, money orders, and credit cards between the pages of the notebook. Sealy explained that his practice is to look between the pages to see if anything of value is lodged there. He does this in order to make sure there is nothing of value hidden or stashed between the pages.

In addition, Sealy explained that it is possible that something from the backpack might have slipped between the pages of the notebook. He noted that shaking the notebook does not guarantee that everything will fall out.

Sealy testified that he found a pawn shop business card between the cover and the first page of the notebook. He also spotted the nine money order receipts within the last five pages of the notebook. Sealy performed an in-court demonstration, which revealed that nothing was visible from merely looking at the sides of the notebook.

Sealy said he thumbed through the notebook, page by page, and used his thumb to control the speed of his review. He was not reading each page because it was only an inventory search. Sealy said the notebook appeared to be a journal, with notes.

However, he spotted a series of numbers which appeared to be social security numbers on two adjacent pages. The entries listed names, dates of birth, social security numbers, addresses in California, and email addresses. Moreover, the format of the two pages was different from the format used in the other pages. It was not in sentence structure. In addition, the nine digits all appeared to be social security numbers, and there did not appear to be numbers on the earlier pages.

Sealy testified that these handwritten entries stood out to him and resembled a ledger with handwritten PII. Sealy said he noticed the PII relatively quickly. The numbers were more than just a series of numbers. Rather, they all had three digits, then a dash, then two digits, then a dash and then four digits -- which is precisely the format for a social security number. Sealy spotted seven social security numbers and seven dates of birth.

Sealy testified that nothing in the notebook related to the operation of a business (which might provide a bona fide reason for writing PII in a notebook).

After realizing that the nine-digit numbers and other information were PII, Sealy said he continued with the inventory of the notebook. The majority of the remaining pages were blank.

9

Sealy testified that possession of four items of another person's PII (without that person's authorization) is a misdemeanor and that possession of five or more is a felony.

Sealy later contacted five of the victims whose social security numbers and other information were written in the notebook found in Brown's backpack, and they confirmed that they had not provided authorization for Brown to have the PII.

As Sealy explained, if police locate items of *evidentiary* value during the inventory search, then they are impounded.

After conducting the inventory on scene, Sealy said he documented what he found on a property receipt form and in an offense incident report. The vehicle was later towed to a tow yard. The items from the notebook were listed as evidence in a PII investigation. Sealy thought they might be linked to a California-based employment fraud scheme which was prevalent during the midst of the COVID-19 pandemic.

Some of the property (such as trash and miscellaneous papers) found in the vehicle was left in the vehicle when it was towed to the yard. The other items were taken to the Aventura Police Department, where they were inventoried again and placed into evidence bags and taken into the property division. The property receipt listed what was evidence as opposed to personal property.

Sealy conducted a post-*Miranda* interview of Brown at the police station. It was audiotaped and videotaped. The initial interview focused on the car theft investigation. During that portion of the interview, Brown changed his story and said he borrowed the

vehicle from a friend and *picked it up at a construction site*. Brown was not charged with possession of a stolen car because Sealy could not establish that Brown knew the vehicle was stolen. Police officers decided to err on the side of caution and not charge Brown with offenses relating to the stolen car.

The nature of the detective's questions then shifted to the PII information in the notebook found in Brown's backpack.

Brown said the journal was for his music lyrics. Sealy showed Brown copies of the pages with the PII, and Brown said his cousin told him to write down that information. As Sealy explained in his testimony, Brown said he did not know why his cousin made the request or who the people were.

Sealy said he believed that the PII written in the notebook was being used in furtherance of potential fraud activity. The names were not recognizable (e.g., they were not names of famous persons). He noted that he has never seen a legitimate business which keeps its employees' PII in the format used in the notebook.

According to Sealy, he had grounds to believe that Brown was in possession of five or more items of PII before he contacted any of the seven PII victims whose names were written in the notebook. Brown had already told Sealy that he did not know any of the seven victims, so he could not have had their permission or authority to possess their PII.

Sealy said he decided to try to contact the PII victims after he finished his interview of Brown.

Sealy explained that he did not arrest Brown immediately after he flipped to the two pages containing PII. Instead, he noted, he conducted an investigation. He had spoken to five of the PII victims by the time Brown was transported to jail.

### III.   The Parties' Contentions

Brown's written suppression motion says it is based, in part, on Sealy's deposition testimony (taken in the state court criminal prosecution). He filed the transcript before the evidentiary hearing. [ECF No. 48-1]. The motion argues that Sealy conducted an unlawful inventory search because "he located a closed notebook with no indication of anything of value inside." The motion further contends that Sealy, "instead of cataloguing the notebook and continuing the search, . . . not only opened the notebook but **flipped through the pages**, consequently finding and reading a page containing names, social security numbers and dates of birth." [ECF No. 25, p. 6 (emphasis added)].

Thus, the motion contends that Sealy stepped outside the boundaries of a permissible inventory search when he opened the notebook and read the contents of two pages. Moreover, the motion argues that Sealy "had no reason to believe there was anything of value in the book." According to the motion, "there were no cards or cash sticking out" and "it appeared to be a normal notebook." *Id.* at 7.

By the end of the evidentiary hearing, however, Brown modified his legal argument. Instead of arguing that Sealy improperly thumbed through the notebook to search for things of value as part of an inventory search and that he unlawfully focused on the PII and read it, Brown urged another theory: he argued that Sealy's purported violation was going back to the police station with the notebook, copying it, and showing Brown the PII-filled pages as part of his follow-up questioning.

Analogizing the warrantless inventory search of the notebook to the warrantless search of the contents of a seized cellular telephone, Brown argued that the issue here is one "of first impression."

Following Sealy's testimony and defense counsel's argument at the hearing, the United States said the issue is surely not one of first impression. The AUSA argued that Sealy was conducting a lawful inventory search, saw the PII in plain view, realized that it was "immediately incriminating" and relied on Florida Statute § 817.5685(3)(b)(1), which provides that proof of a person's possession of five or more people's PII, "unless satisfactorily explained, gives rise to an inference that" he "did so knowingly and intentionally without authorization."

This, the United States contends, means that Sealy could have arrested Brown immediately after observing that much PII in his notebook. Furthermore, the United States argues, the statute also means that the notebook pages containing the PII were "contraband or evidence of a crime."

The United States also relies on the automobile exception to justify the warrantless search of the stolen car. It points out that Defendant argued at the hearing that Sealy's search could not have been justified by the automobile exception because he did not subjectively intend to rely on that exception. However, the United States emphasizes that a police officer's *subjective* reasons for a search do not control the legal justification for his action. Thus, the Government notes, the search is valid if objective circumstances the officer did not rely on otherwise in fact justify the search.

In the required post-hearing memorandum, Brown argued that the stolen car was not "readily mobile" because Brown was not free to "drive away with the vehicle." [ECF No. 55, p. 2]. But the United States contends that this argument has already been rejected by our appellate court, which has held that "readily mobile" means "functionally operational." [ECF No. 56, p. 2 (citing *United States v. Gooden*, 148 F. App'x 846, 848 (11th Cir. 2005))]. The stolen Escape Brown was driving was operational. Brown drove it into the Bloomingdale's parking garage and was confronted as he was driving it within the garage.

The United States also condemns Brown's cellphone analogy, pointing out that the cellphone has not yet been searched while the notebook had *already* been lawfully searched under both the automobile exception and the inventory exception to the Fourth Amendment.

14

## IV.   <u>Conclusions of Law</u>

<u>Inventory Search</u>

Inventory searches are intended not for investigatory purposes or rummaging for evidence, but "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987). Accordingly, an "inventory search permits a thorough search of property lawfully in police custody," *United States v. O'Bryant*, 775 F.2d 1528, 1534 (11th Cir. 1985), including "closed containers" within a car. *Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992).

That search must be "consistent with the police caretaking function," *O'Bryant*, 775 F.2d at 1534, and cannot "exceed that necessary to accomplish the ends of the inventory." *United States v. Khoury*, 901 F.2d 948, 958 (11th Cir.), *opinion modified on other grounds,* 910 F.2d 713 (11th Cir. 1990). It is the Government's burden to show that the search followed standardized criteria. *Sammons,* 967 F.2d at 1543.

The Undersigned concludes that Sealy's inventory search followed his department's policies and procedures. The Undersigned finds Sealy's testimony credible, comprehensive, detailed, reliable, and consistent.

Sealy was legitimately concerned that items of value could be between the pages of the notebook. In fact, a business card was found between the cover and the first page and other receipts were located between the pages. Sealy did not use the inventory search

as a ruse to search the notebook for evidence; he conducted a bona fide inventory search and spotted PII in plain view while thumbing through the pages.

In other words, Sealy spotted contraband during his initial search and did not need to conduct a *later,* follow-up search.

Courts "routinely ha[ve] held that containers and packages found during a legitimate warrantless search of an automobile also could be searched without a warrant." *United States v. Ross*, 456 U.S. 798, 819 (1982).

Other circuits agree with the Eleventh Circuit about the lawfulness of reviewing a notebook as part of a legitimate inventory search. *See United States v. Andrews*, 22 F.3d 1328, 1335 (5th Cir. 1994) (officer did not violate the Fourth Amendment by"[o]pening a notebook, to determine whether valuables might be found between its pages"); *United States v. Nagano*, 959 F.2d 243 (9th Cir. 1992) ("It also was reasonable for Babauta to leaf through the notebook to see if anything was stuck inside."); *United States v. Pace*, 898 F.2d 1218, 1243 (7th Cir. 1990) (suppression not warranted when officer "leaf[ed] through the pages of the record books and examin[ed] the receipts"); *United States v. Arango-Correa*, 851 F.2d 54, 59 (2d Cir. 1988) (agents "opened two notebooks" and "perused the contents" during an inventory search).

Given that Sealy, an experienced fraud detective, was engaged in a lawful inventory search of Brown's notebook, he was permitted under the plain-view doctrine to seize the notebook because its incriminating nature was readily apparent to him. *See*

16

*United States v. Boffil-Rivera*, No. 08-CR-20437-EGT, 2008 WL 11409409, at *4 (S.D. Fla. Aug. 12, 2008) ("It is elemental that agents who find incriminating evidence while conducting a proper inventory search will set that material aside for possible use in a criminal investigation."), report and recommendation adopted *sub nom. United States v. Gonzales-Rodriguez*, No. 08-CR-20437-DLG, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008); *see also United States v. Reeves*, 604 F. App'x 823, 826 (11th Cir. 2015) ("The plain-view doctrine permits the warrantless seizure of an object where an officer is lawfully located in a place from which the object can be plainly viewed, the officer has a lawful right to access the object, and the incriminating character of the object is 'immediately apparent.'" (quoting *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006))).

An item's incriminating character is "immediately apparent" when police have probable cause to believe the object in plain view is contraband or evidence of a crime. *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). "Where an object may lawfully be seized under the plain-view doctrine, it **also** may validly be **searched**." *Reeves*, 604 F. App'x at 826 (emphasis added).

Sealy was allowed to search through the rest of the pages to complete his search for items of value between the pages once the incriminating nature of the PII was apparent to him, and he was also permitted to seize the entire notebook and search it for additional incriminating evidence. *See Smith*, 459 F.3d at 1292 ("Since the individual documents contained in the file could be legitimately seized under the plain view

exception, [the officer] acted reasonably in ordering the seizure of the entire file." (internal quotation omitted)); *Khoury,* 901 F.2d at 957 ("[A] legitimate non-pretextual inventory search is not made unlawful simply because the investigating officer remains vigilant for evidence during his inventory search.").

Although the instant prosecution is a federal case, there is nothing to prevent Sealy, an Aventura police detective, from relying on a Florida statute providing that proof of a person's possession of five or more other people's PII, "unless satisfactorily explained, gives rise to an inference that" he did so knowingly and intentionally without authorization. Fla. Stat. § 817.5685(3)(b)(1). Armed with that statutory inference, Sealy was able to conclude that the notebook pages were, in effect, contraband or evidence of a crime. *Reeves,* 604 F. App'x at 826.

Brown has not submitted any persuasive legal authority or argument suggesting that Sealy could seize only contraband which violated a *federal* criminal statute, as opposed to a state statute.

Similarly, Brown has not called the Undersigned's attention to any binding or persuasive authority to support his argument that Sealy somehow acted unlawfully when he later photocopied the notebook and presented the incriminating pages to Brown during his post-*Miranda* interview. Brown's post-hearing memorandum relies on *Khoury* -- but fails to acknowledge the distinguishing facts there.

18

In *Khoury*, the agent inspected a defendant's notebook inside a closed briefcase "by flipping through the pages for items of value" "hidden between the pages." 901 F.2d at 957, 959. The agent observed enough briefly to determine that the notebook "was a diary of some sort," which the Eleventh Circuit found reasonable because it "satisfied the requisites of the inventory search." *Id.* However, the Court found the agent's subsequent conduct unreasonable when he searched through the notebook a *second* time upon realizing that it might be of evidentiary value. *Id*.

But in the instant case, Sealy searched through the notebook only *once*, just like the agent's initial review that the Eleventh Circuit found reasonable. He thumbed through each page in search of items of value, but, **unlike** the agent in *Khoury*, Sealy immediately recognized contraband during the initial inventory search without the need for a subsequent search.

Therefore, Sealy "served the purposes of the inventory by thumbing through the notebook, permitting him to ascertain that nothing of value was secreted between the pages while also determining that the notebook was of value to [Brown]." *Id.* at 957; *see also Reeve*s, 604 F. App'x at 827–28 (upholding an officer's warrantless vehicle search of a notebook "to determine if there were any drugs hidden within it" where "the magistrate judge found, based on [the officer's] testimony, that through his training and experience [the officer] was aware that individuals will sometimes conceal narcotics between pages or even secrete narcotics into the pages themselves").

The Undersigned also rejects as unconvincing Brown's argument (relying on *Riley v. California,* 573 U.S. 373 (2014)) that the notebook is similar to a cell phone which had not yet been searched (and which would trigger a warrant requirement in the absence of consent to search the phone). Brown contends that "there is no difference between *information* in a cellphone and written *information* on a page, other than the way the *information* is stored." [ECF No. 55, p. 4 (emphasis in original)].

But the Supreme Court rejected that very argument raised by the United States in *Riley (*where the Government advocated for the position that "a search of all data stored on a cell phone is 'materially indistinguishable' from searches of . . . physical items" like an "**address book**," "wallet," or "purse." 573 U.S. at 392-93 (emphasis added). In fact, the Supreme Court quickly disregarded that theory, noting that "[t]hat is like saying a ride on horseback is materially indistinguishable from a flight to the moon," and it concluded that "[c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person." *Id*. at 393.

Therefore, *Riley* clearly distinguished between the information on a cellphone and physical evidence, which, once seized lawfully, can be searched without a warrant. *Reeves,* 604 F. App'x at 826 ("Where an object may lawfully be seized under the plain-view doctrine, it also may validly be searched.").

Finally, the Undersigned also rejects as unpersuasive Brown's last, summary-type argument:

> As with a cellphone discussed above, after [ ] Defendant's notebook was seized and under the exclusive control of law enforcement, if law enforcement desired to again search and copy the information written on the pages, they needed a search warrant no matter the particular offense being investigated. To say otherwise would permit law enforcement to dictate what Fourth Amendment rights a defendant has by asserting that they are investigating one criminal offense or another.

[ECF No. 55, p. 5].

Brown cites no applicable case or other on-point authority to support this novel theory.

<u>Automobile Exception</u>

The automobile exception generates *another* ground to conclude that Sealy's search of the notebook was lawful.

"For a warrantless search of an automobile to be constitutional, (1) the automobile must be readily mobile,[2] and (2) there must be probable cause to believe that it contains

---

[2]     Brown argues in his post-hearing memorandum that the automobile exception "cannot be fulfilled" because the automobile was not readily mobile because the officers "were not going to permit the Defendant to drive away with the vehicle." But the Eleventh Circuit has upheld searches of operational vehicles under the automobile exception when, as is the case here, police have stopped the vehicle during an investigation.

Indeed, in *Gooden,* the police had smelled the odor of marijuana coming from the car and had already arrested the driver for actual possession of crack cocaine found in his pocket. 148 F. App'x 846, 848 (noting that "officers can search any container in an operational car without a warrant if they have probable cause to believe that the container

contraband or evidence of a crime."[3] *United States v. Lanzon*, 639 F.3d 1293, 1299–300 (11th Cir. 2011) (footnote added).

Probable cause means "a **fair probability** that contraband or evidence of a crime will be found in the vehicle under the totality of the circumstances." *Id*. at 1300 (emphasis added).

Although Sealy's subjective intent in searching the car and thumbing through the notebook pages was to conduct an inventory, the United States can still rely on the automobile exception if its elements have been met. "A police officer's subjective reasons for a search do not control the legal justification for his actions, as long as objective circumstances justify the search." *Id*. (citing *Scott v. United States*, 436 U.S. 128, 136 (1978)).

Whether probable cause exists is an objective inquiry, and "'[a] police officer's subjective reasons for a search do not control the legal justification for his actions, as long as objective circumstances justify the search.'" *United States v. King*, 634 F. App'x 287, 290 (11th Cir. 2015) (quotng *Lanzon*, 639 F.3d at 300*). Cf. Devenpeck v. Alford*, 543 U.S. 146, 153,

---

holds evidence of a crime") (citing *California v. Acevedo*, 500 U.S. 565, 579-80 (1991)); *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003). Obviously, the police officers in *Gooden* were not going to allow the defendant to drive away in the car after arresting him, but the appellate court affirmed the ruling that the automobile exception authorized the search of the car because it was inherently mobile. *Id.*

[3]      In this same post-hearing memorandum, Brown acknowledges that "the second requirement **can** be fulfilled, to wit: that there is a fair probability that **evidence of a crime** (the theft of the vehicle) will be **found in the vehicle**." [ECF No. 55, p. 2 (emphasis added)].

125 S. Ct. 588, 594, 160 L. Ed. 2d 537 (2004) ("[An arresting officer's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. As we have repeatedly explained, 'the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'" (quoting *Whren v. United States*, 517 U.S. 806, 814, (1996)); *United States v. Nicholl*, No. 120CR00386JPBJSA1, 2022 WL 420940, at *3 (N.D. Ga. Feb. 11, 2022) ("When assessing whether an officer had probable cause for an arrest, courts are not limited to a consideration of whether probable cause existed for the specific offense cited by the officer."); *United States v. Villa*, No. 1:11-CR-118-ODE-ECS, 2011 WL 7658140, at *4 (N.D. Ga. Sept. 20, 2011), report and recommendation adopted, No. 1:11-CR-118-L-ODE, 2012 WL 1155708 (N.D. Ga. Apr. 5, 2012) ("[T]he officers in this case were possessed of probable cause to support [the] [d]efendant's arrest for obstruction of a police officer under state law. It matters not whether the officers subjectively believed that probable cause existed for another offense or that they may have announced the wrong offense in making the arrest or that the formal arrest may have followed the search.").

Therefore, Sealy's decision to classify the search as an inventory search does not somehow invalidate the conclusion that he also had probable cause to search the car under the automobile exception (i.e., searching a stolen car which was mobile, looking

for paperwork relevant to showing who was driving the car, and whether that person had authority to drive it or whether the vehicle was stolen).

Courts have evaluated the probable cause requirement under the automobile exception in similar circumstances and have concluded that a search is proper because there is likely to be evidence of a stolen car's ownership and use inside of it. *See United States v. Edwards*, 769 F.3d 509, 516 (7th Cir. 2014) (where a stolen car's driver was arrested and placed "in the back of [a] squad car," finding that the subsequent search of the car "fits comfortably within the automobile exception" because "[w]hen a car is reported stolen and is recovered, the police have probable cause to look in the car for some evidence of ownership"); *United States v. Allen,* No. 20-CR-00300-HSG-1, 2022 WL 17178306, at *3 (N.D. Cal. Nov. 23, 2022) (denying suppression of fruits of a warrantless search of a stolen car "under the automobile exception" because "there was . . . probable cause to believe that evidence of . . . either car theft or knowing possession of a stolen car . . . would be located in the car" and "that evidence relevant to who owned the car and how [the] [d]efendant came to be in possession of it would be found in the car itself").

To summarize, the automobile exception provides an alternate, additional ground to uphold the search and seizure of Brown's notebook.

## V.     Conclusion

The Undersigned **respectfully recommends** that Judge Moreno **deny** in whole Brown's motion.

## VI.    <u>Objections</u>

The parties will have ten (10) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with Judge Moreno. Each party may file a response to the other party's objection within ten (10) days of the objection.[4] Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on February 9, 2023.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>Copies furnished to</u>:
The Honorable Federico A. Moreno
All counsel of record

---

[4]    The Undersigned is slightly shortening the deadlines for Objections and Responses because the issues have been amply briefed and because of the upcoming trial date.